FILED
United States Court of Appeals
Tenth Circuit

December 16, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

POLLY BACA; ROBERT NEMANICH,

Plaintiffs-Appellants,

v.

JOHN W. HICKENLOOPER, JR., in his official capacity as Governor of Colorado; CYNTHIA H. COFFMAN, in her official capacity as Attorney General of Colorado; WAYNE W. WILLIAMS, in his official capacity as Colorado Secretary of State,

Defendants-Appellees.

------------------------------

COLORADO REPUBLICAN COMMITTEE; DONALD J. TRUMP; DONALD J. TRUMP FOR PRESIDENT, INC.,

Intervenors-Appellees.

No. 16-1482

(D.C. No. 1:16-CV-02986-WYD-NYW)
(D. Colo.)

---

**ORDER**

---

Before **BRISCOE**, **McHUGH** and **MORITZ**, Circuit Judges.

---

Plaintiffs/appellants Polly Baca and Robert Nemanich have filed an emergency motion for injunction pending appeal. For the reasons outlined below, we deny their motion.

I

*Colorado's Presidential Electors Statute*

Colorado's Presidential Electors statute, Colo. Rev. Stat. 1-4-304, provides as follows:

> (1) The presidential electors shall convene at the capital of the state, in the office of the governor at the capitol building, on the first Monday after the second Wednesday in the first December following their election at the hour of 12 noon and take the oath required by law for presidential electors. If any vacancy occurs in the office of a presidential elector because of death, refusal to act, absence, or other cause, the presidential electors present shall immediately proceed to fill the vacancy in the electoral college. When all vacancies have been filled, the presidential electors shall proceed to perform the duties required of them by the constitution and laws of the United States. The vote for president and vice president shall be taken by open ballot.
>
> (2) The secretary of state shall give notice in writing to each of the presidential electors of the time and place of the meeting at least ten days prior to the meeting.
>
> (3) The secretary of state shall provide the presidential electors with the necessary blanks, forms, certificates, or other papers or documents required to enable them to properly perform their duties.
>
> (4) If desired, the presidential electors may have the advice of the attorney general of the state in regard to their official duties.
>
> (5) Each presidential elector shall vote for the presidential candidate and, by separate ballot, vice-presidential candidate who received the highest number of votes at the preceding general election in this state.

Colo. Rev. Stat. § 1-4-304.

*Plaintiffs/appellants*

Baca is a resident of the City and County of Denver, Colorado. Nemanich is a

resident of El Paso County, Colorado. Both Baca and Nemanich were nominated at the Democratic Convention on April 16, 2016, to be Presidential Electors for the State of Colorado. Both were required to sign affidavits at that time affirming that they would cast their ballots on December 19, 2016, for the Democratic Presidential and Vice-Presidential candidates.

Baca and Nemanich concede that the Democratic candidates for President and Vice-President, Hillary Clinton and Timothy Kaine, received the highest number of votes in the State of Colorado during the general election held on November 8, 2016. Baca and Nemanich also concede that, given these election results, Colo. Rev. Stat. § 1-4-304(5) mandates that they cast their votes for Clinton and Kaine.

Baca and Nemanich allege, however, that they "cannot be constitutionally compelled to vote for" Clinton and Kaine, and are instead "entitled to exercise their judgment and free will to vote for whomever they believe to be the most qualified and fit for the offices of President and Vice President." Complaint at 4. "For example," they allege, they "may vote for a consensus candidate, other than Clinton or Trump, upon whom electors from both parties and along the ideological spectrum can agree, so as to prevent" the Republican Presidential and Vice-Presidential Candidates, Donald Trump and Michael Pence, "from ascending to the highest offices in the United States." Id.

*The Colorado Secretary of State's response*

On or about November 18, 2016, Nemanich contacted Colorado's Secretary of State, Wayne Williams, and asked "what would happen if" a Colorado state elector

"didn't vote for . . . Clinton and . . . Kaine." Id., Att. 1 at 7 (Nemanich Affidavit at 3). Williams responded, by email, saying that "if an elector failed to follow th[e] requirement" outlined in Colo. Rev. Stat. § 1-4-304(5), his "office would likely remove the elector and seat a replacement elector until all nine electoral votes were cast for the winning candidates." Id. at 9.

In recent days, Williams has allegedly instituted a new oath to be given to Colorado's Electors on December 19, 2016, and has stated that if an elector violates Colo. Rev. Stat. § 1-4-304(5), they will likely face either a misdemeanor or felony perjury charge.

*Plaintiffs' initiation of this action*

On December 6, 2016, plaintiffs initiated this action by filing a verified complaint against three Colorado state officials: Governor John Hickenlooper, Jr., Attorney General Cynthia Coffman, and Secretary of State Wayne Williams. The complaint alleged, in pertinent part, that Colo. Rev. Stat. § 1-4-304(5) violates Article II of the United States Constitution, as amended by the Twelfth Amendment, and compels speech in violation of the First Amendment.

On that same date, plaintiffs also filed a motion for temporary restraining order and preliminary injunction. They alleged in their motion that they were "substantially likely to prevail on the paramount issue that Colorado's elector binding statute, [Colo. Rev. Stat.] § 1-4-304(5), is unconstitutional because it violates Article II of the U.S. Constitution, as amended by the Twelfth Amendment, and it compels speech in violation

of the First Amendment." Dist. Ct. Docket No. 2 at 4. They asked for an order declaring Colo. Rev. Stat. § 1-4-304(5) unconstitutional. They also asked for an order "temporarily and preliminarily enjoining and restraining Defendants . . . from removing or replacing [them] as electors, compelling them to vote for certain candidates, precluding them from voting for any candidates, or otherwise interfering with the vote of the electors on December 19, 2016." Id. at 14.

*The district court's denial of plaintiffs' motion*

On December 12, 2016, the district court held a hearing on plaintiffs' motion and, at the conclusion of the hearing, orally denied the motion. In doing so, the district court concluded that plaintiffs failed to establish a substantial likelihood of success on the merits of their claims. The district court also concluded that "granting an injunction would irreparably harm the status quo and the public's general expectations." Dist. Ct. Docket No. 23 at 68. Further, with respect to the balance of harms, the district court found that "the last-minute nature of this action . . . tip[ped] the scales in favor of the defendants rather than the plaintiff[s]." Id. at 69. Relatedly, the district court concluded that the public's interest "in fair and effective elections, political stability, [and the] legitimacy of the eventual winner . . . would be adversely affected if [it] granted this injunction." Id. at 70. Indeed, the district court concluded that granting the injunction "would undermine the electoral process and unduly prejudice the American people by prohibiting a successful transition of power." Id.

*Plaintiffs' appeal*

Plaintiffs filed a notice of appeal on December 13, 2016, and have since filed with this court their emergency motion for injunction pending appeal.

II

The issuance of an injunction pending appeal unquestionably amounts to "extraordinary relief." Hobby Lobby Stores, Inc. v. Sebelius, — U.S. —, 136 S. Ct. 641, 643 (2012); see Ruckelshaus v. Monsanto Co., 463 U.S. 1315, 1316 (1983) (holding that "a stay pending appeal" will be granted "only under extraordinary circumstances"). "In ruling on . . . a request" for injunction pending appeal, "this court makes the same inquiry as it would when reviewing a district court's grant or denial of a preliminary injunction." Homans v. City of Albuquerque, 264 F.3d 1240, 1243 (10th Cir. 2001). Thus, the applicant must establish (1) "the likelihood of success on appeal," (2) "the threat of irreparable harm if the stay or injunction is not granted," (3) "the absence of harm to opposing parties if the stay or injunction is granted," and (4) that the public interest will not be harmed if the stay or injunction is granted. Id.

As discussed below, we conclude, after considering these four factors in light of the preliminary record before us, that the district court did not "abuse[] its discretion" in denying plaintiffs' motion for temporary restraining order and preliminary injunction and that plaintiffs have not "demonstrated a clear and unequivocal right to relief." Id.

*Likelihood of success on appeal*

In analyzing plaintiffs' likelihood of success on appeal, we begin by addressing

defendants' assertion that plaintiffs lack standing. We then turn to the question of whether plaintiffs have established a likelihood of success on appeal on their claims that Colo. Rev. Stat. § 1-4-304(5) violates Article II and the Twelfth Amendment of the United States Constitution, and the First Amendment of the United States Constitution.

*a) Plaintiffs' standing*

Defendants argue that plaintiffs are, in essence, state officials who lack Article III standing to challenge the constitutionality of a state statute. In support, they cite primarily to the Supreme Court's decision in Columbus & Greenville Ry. v. Miller, 283 U.S. 96, 99-100 (1931). We are not persuaded, however, that Columbus necessarily leads to the conclusion that the plaintiffs in this case lack standing. Columbus involved a challenge by a state tax collector to the validity of a state tax law. Notably, the taxpayer in Columbus, i.e., the party directly affected by the state tax law, conceded the validity of the law. In the instant case, in contrast, plaintiffs allege that Colo. Rev. Stat. § 1-4-304(5) infringes upon their own personal constitutional rights. At this stage of the proceedings, and given the preliminary record before us, we conclude that is sufficient to provide them with standing to challenge Colo. Rev. Stat. § 1-4-304(5). See Coleman v. Miller, 30 U.S. 433, 438 (1939) (holding that state legislators had standing to restrain action on a resolution, as they had "a plain, direct and adequate interest in maintaining the effectiveness of their votes").

*b) The Article II and Twelfth Amendment claim*

As noted, plaintiffs argue that Colo. Rev. Stat. § 1-4-304(5) violates Article II, as

amended by the Twelfth Amendment, by requiring electors to vote for the presidential and vice-presidential candidates who received the highest number of votes in the State of Colorado during the general election. In addressing this argument, we begin by examining the relevant provisions of the Constitution.

The Constitution mandates that the election of the President of the United States occur by way of the Electoral College, rather than by individual voters at the general election, and it outlines both how the Electoral College is to be created and how it shall operate. In particular, Article II Section 1 of the Constitution provides, in pertinent part:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.
>
> * * *
>
> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

U.S. Const. art. II, § 1.[1]

As originally established, Article II section I also addressed the details of how Electors would cast their votes and how those votes would be counted. That language was superseded by the Twelfth Amendment to the Constitution, which was ratified on June 15, 1804. The Twelfth Amendment provides, in pertinent part:

---

[1] This latter provision has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections. Burroughs v. United States, 290 U.S. 534 (1934).

> The Electors shall meet in their respective states, and vote by ballot for President and Vice President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted.;—The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. * * * The person having the greatest number of votes as Vice-President, shall be Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

U.S. Const. amend. XII.

Lastly, Section 3 of the Fourteenth Amendment addresses who may not serve as a State Elector:

> No person shall be . . . [an] elector of President and Vice President . . . who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same or given aid or comfort to the enemies thereof.

U.S. Const. amend. XIV, § 3.

Plaintiffs argue that Colo. Rev. Stat. § 1-4-304(5) violates Article II and the Twelfth Amendment by rendering electors superfluous. In making this argument, however, plaintiffs fail to quote any of these provisions of the Constitution. And, more importantly, they fail to point to a single word in any of these provisions that support their position that the Constitution requires that electors be allowed the opportunity to exercise their discretion in choosing who to cast their votes for.[2] We conclude that this failure is fatal at this stage of the litigation. As noted, it is plaintiffs' burden to establish a likelihood of success on appeal. By failing to point us to any language in the Constitution that would support their position, we conclude they have failed to meet their burden.[3]

But even if we were to overlook the plaintiffs failure to point us to the Constitutional language that supports their position, they raise at best a debatable

---

[2] Instead, plaintiffs point primarily to statements made by Alexander Hamilton in The Federalist No. 68. E.g., Dist. Ct. Docket No. 2 at 6; Emergency Motion at 10. Although we turn to external sources when unable to discern the meaning of the Constitution from its plain language, we begin our analysis with careful examination of the words used. Here, plaintiffs make no textual argument, at all.

[3] This is not to say that there is no language in Article II or the Twelfth Amendment that might ultimately support plaintiffs' position. See Ray v. Blair, 343 U.S. 214, 232 (1952) ("No one faithful to our history can deny that the plan originally contemplated, *what is implicit in its text*, that electors would be free agents, to exercise an independent and nonpartisan judgment as to the men best qualified for the Nation's highest offices." (emphasis added)). For example, there is language in the Twelfth Amendment that could arguably support the plaintiffs' position. E.g., Michael Stokes Paulsen, The Constitutional Power of the Electoral College, Public Discourse (Nov. 21, 2016) (available at www.thepublicdiscourse.com/2016/11/18283/). But it is not our role to make those arguments for them.

argument. Defendants point instead to the direction that: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . ." U.S. Const. Art. II, § 2. And they argue that the Supreme Court has held this power to be plenary under McPherson v. Blacker, 146 U.S. 1, 35-36 (1892). Accordingly, we cannot conclude the plaintiffs have met their burden of showing a likelihood of success on the merits.

Plaintiffs also argue that "[r]equiring an Elector to vote is clearly an improper qualification because it mandates that only the people that agree to vote for particular candidates are allowed (*i.e.*, qualified) to become Electors." Emergency Motion at 7-8. We are not persuaded, however, that the requirement to vote consistent with the majority vote in the state is a "qualification." The term qualification suggests a preexisting condition or quality that either renders a person eligible or ineligible to be an Elector. See Oxford Dictionaries (defining qualification as "[a] quality or accomplishment that makes someone suitable for a particular job or activity"; "[a] condition that must be fulfilled before a right can be acquired; an official requirement."). Under this definition, a pledge to vote for a particular candidate (like the ones that the plaintiffs in this case made to vote for the Democratic nominees for President and Vice-President) would be a qualification. But a statutory requirement to vote in a certain way, like the one in Colo. Rev. Stat. § 1-4-304(5), is more in the way of a duty than a qualification.

Lastly, plaintiffs argue that Colo. Rev. Stat. § 1-4-304(5) violates the Supremacy Clause by usurping Congress's exclusive power to count electoral votes. Emergency

Motion at 12 (citing U.S. Const. amend. XII and 3 U.S.C. § 15). In support, plaintiffs argue that Colo. Rev. Stat. § 1-4-304(5) "gives Colorado the authority to discount/delete/ignore an elector's vote for persons who did not win the popular vote in the state." Id. In turn, they argue that "[i]f Congress counts the votes, and it has counted over 150 'faithless' electors' votes over the centuries, the states lack the power to count an electors' [sic] vote," and thus "the statute is unconstitutional." Id.

The problem with this argument is that, according to the limited record before us, defendant Williams' threat to remove and place any elector who fails to comply with Colo. Rev. Stat. § 1-4-304(5) is not based on the text of that provision, but rather upon his interpretation of the authority afforded to him under Colo. Rev. Stat. § 1-4-304(1). As noted above, § 1-4-304(1) expressly affords the State of Colorado with authority to "fill [any] vacanc[ies] in the electoral college" prior to the start of voting. Whether that statute also affords the State with authority to remove an elector after voting has begun is not a question that has been posed by plaintiffs to either the district court or this court.[4]

*c) The First Amendment claim*

Plaintiffs also argue that Colo. Rev. Stat. § 1-4-304(5) violates their First Amendment rights by burdening their core political speech and compelling them to vote in a certain way. The problem for plaintiffs at this stage, however, is that they fail to identify any authority establishing, or even remotely suggesting, that the First

---

[4] And we deem such an attempt by the State unlikely in light of the text of the Twelfth Amendment.

Amendment applies to electors. See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984) (holding that "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). For these reasons, we conclude that plaintiffs have failed to establish a likelihood of success on the merits of the claims asserted in their appeal.

*Irreparable harm*

Plaintiffs argue that they will suffer irreparable harm if an injunction is not granted pending appeal. In support, they argue that, in light of defendant Williams' statements to date, there is a substantial likelihood that he will remove and replace them if they fail to vote for Clinton and Kaine. The problem with this argument is two-fold. First, as we have discussed, plaintiffs have failed to establish a likelihood of success on the merits of their constitutional challenges to Colo. Rev. Stat. § 1-4-304(5). In other words, they have failed at this point to establish that the State of Colorado cannot constitutionally require them to vote for Clinton and Kaine. Second, any removal and replacement authority that defendant Williams may possess derives not from § 1-4-304(5), but rather from § 1-4-304(1). While we question whether that subsection provides him any such authority after voting has commenced, that precise question is not before us.

Plaintiffs also argue that defendant Williams has threatened to charge them with a felony or misdemeanor if they fail to comply with § 1-4-304(5). The district court declined to address this argument because plaintiffs presented it for the first time at the hearing on their motion for temporary restraining order and preliminary injunction. Dist.

Ct. Docket No. 23 at 66. We conclude that the district court did not abuse its discretion in this regard and thus adopt the same position.

*Harm to opposing parties if the injunction is granted*

Plaintiffs argue that "[n]o hardship will occur to Defendants or the State if the injunction is implemented." Emergency Motion at 18. They explain that "[t]here will be no need to re-do the election" because when the people of Colorado "cast their ballots for presidential and vice-presidential candidates, they were voting for electors specific to political parties/candidates," and "[i]t is up to those electors, who have now been chosen by the people of Colorado, to choose the best candidates." Id. Further, they argue, the injunction would "not require Defendants to take any action," and would "merely prevent[] Defendants from enforcing an unconstitutional statute." Id. at 19.

The district court considered and rejected these very same arguments in denying plaintiffs' motion for temporary restraining order and preliminary injunction. In doing so, it concluded that "the last-minute nature of this action, coupled with the potentially stifling effects it may have on our country, . . . tip[ped] the scales in favor of the defendants." Dist. Ct. Docket No. 66 at 69. We are unable to say that this amounted to an abuse of discretion, particularly given our conclusion that plaintiffs have failed to establish a likelihood of success on appeal.

*Public interest*

Finally, plaintiffs argue that the public interest weighs in favor of granting the requested injunction because "[t]he public has a strong interest in the protection and

enforcement of the rights established by the First and Fourteenth Amendments." Emergency Motion at 19. "The public," plaintiffs argue, also "has a strong interest in having the Electoral College operate as intended by deliberating and selecting a President and Vice-President who they believe best qualified." Id. Lastly, plaintiffs argue that "[t]he public has a significant interest in making sure fit and competent leaders are elected." Id.

The district court considered and rejected these same arguments, and instead concluded that granting plaintiffs' requested injunctive relief "would undermine the electoral process and unduly prejudice the American people by prohibiting a successful transition of power." Dist. Ct. Docket No. 66 at 70. We are unable to say that this amounted to an abuse of discretion, given plaintiffs' failure to establish a likelihood of prevailing on appeal.

III

Plaintiffs' emergency motion for injunction pending appeal is DENIED.

Entered for the Court

Elisabeth A. Shumaker, Clerk